UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------- x
                                   :
EXTENET SYSTEMS, LLC,              :
                                   :   **MEMORANDUM AND ORDER**
              Plaintiff,           :   **GRANTING PRELIMINARY**
                                   :   **INJUNCTION AND DENYING**
    -against-                      :   **MOTION FOR INTERVENTION**
                                   :
VILLAGE OF KINGS POINT,            :   No. 21-cv-5772 (KAM)(ST)
                                   :
              Defendant.           x

---------------------------------

**MATSUMOTO, United States District Judge:**

On October 15, 2021, Plaintiff ExteNet Systems, LLC
f/k/a ExteNet Systems, Inc. ("ExteNet") filed this action against
Defendant Village of Kings Point (the "Village").  (ECF No. 1,
Complaint ("Compl.").)  Plaintiff alleges that Defendant
unlawfully denied its application for a special exception permit
to install thirty-one small wireless facilities in the Village to
improve wireless service, in violation of certain provisions of
the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. §§ 151 *et
seq.*  (*Id.* ¶¶ 11–13.)  Plaintiff seeks expedited review and
declaratory relief.  (*Id.* ¶¶ 150–75.)

Before the Court is Plaintiff's motion for a preliminary
injunction, requesting that the Court order the Village to issue
the special exception permit.  Also before the Court is a motion
to intervene in the action by eight residents of the Village:
Edward Roubeni, Sepy Roubeni, Arman Noghreh, Mojdeh Noghreh, Tali

1

Damaghi, David Damaghi, Honey Damaghi, and Herzel Owadeyah (together, "proposed intervenors"). For the reasons set forth below, the proposed intervenors' motion to intervene is respectfully **DENIED**, and Plaintiff's motion for a preliminary injunction is **GRANTED**.

## FACTUAL FINDINGS

The Court makes the following factual findings, based on the parties' Joint Stipulation of Facts, and declarations and exhibits attached thereto. (*See generally* ECF Nos. 17-2, Joint Stipulated Statement of Facts & Common Definition of Terms ("Joint Stipulation of Facts"); 17-3—17-33, Declaration of Richard Lambert ("Lambert Decl.") and exhibits attached thereto; 17-34—37, Declaration of Christian Fridrich ("Fridrich Decl.") and exhibits attached thereto; 18-2—18-9, Declaration of Michael Kalnick ("Kalnick Decl.") and exhibits attached thereto; and 18-10—13, Declaration of Natalie Nejat ("Nejat Decl.") and exhibits attached thereto.)

ExteNet is a national provider of converged communications infrastructure and telecommunications services, authorized to provide wholesale, facilities-based telecommunications services in 45 states and the District of Columbia. (Lambert Decl. ¶ 2.) ExteNet holds a Certificate of Public Convenience and Necessity from the New York State Public Service Commission, which grants it authority to construct

telecommunications networks in the state. (Lambert Decl. ¶¶ 3—4; Exhibit 1 to Lambert Decl.)

ExteNet constructs, owns, operates, and maintains small wireless facilities, commonly referred to as "small cells." (Joint Stipulation of Facts ¶ 1.) Small cells, which consist of small antennas, roughly two to three feet in height, and equipment boxes that are approximately three cubic feet in volume, are typically attached to existing utility poles or other structures in the public rights-of-way. (Joint Stipulation of Facts ¶ 3; Lambert Decl. ¶ 6.) Compared to macro-cellular towers, which are typically over 100 feet tall and provide service extending mile(s), small cells employ low-power transmitters with a more localized service radius, in the hundreds of feet. (Joint Stipulation of Facts ¶¶ 2—3.) Small cells, which are individually referred to as "nodes" and make up a distributed antenna system ("DAS"), are typically fiber linked and deployed to complement macro-cellular tower services, ameliorating poor wireless coverage or adding capacity in high-demand areas (referred to generally as network densification). (*Id.* ¶ 4.)

The Village is a municipal corporation of the State of New York. (*Id.* ¶ 5.) The Village Board of Trustees (the "Board") is the legislative body of the Village with the powers provided in Village Law § 4-412, which include, by virtue of the Village Code, the power to grant special exception permits and the authority to

manage access to public rights-of-way for equipment used in the provision of telecommunications services. (*Id.* ¶ 6.) Section 161, Article XII of the Village Code, titled Telecommunications Towers, governs permitting of wireless telecommunications facilities, including small cells, in the Village. (*Id.* ¶ 7.)

In approximately 2017, ExteNet was engaged by Verizon Wireless ("Verizon") to design a small cell DAS network, obtain all required municipal permits, and install and operate the small cells within the Village over an area that Verizon had identified as needing improved coverage (the "coverage contour"). (*Id.* ¶ 8.) Based on the coverage contour defined by Verizon, ExteNet's radiofrequency ("RF") engineer, with input and approval from Verizon's engineers, designed a 31-node DAS network. (Lambert Decl. ¶ 23.)

In mid-2017, ExteNet contacted the Village to discuss its proposal to install a small cell DAS network on behalf of Verizon to improve wireless service in the Village. (Joint Stipulation of Facts ¶ 9.) In January 2018, ExteNet had its first meeting with the Board. (*Id.* ¶ 10.) At that first meeting, ExteNet presented general information about small cell technology and DAS networks, and provided a map of the existing Verizon coverage, a map showing the coverage contour ExteNet sought to address, and examples of different types of small cell installations (e.g., on utility poles, lampposts, street signs).

4

(*Id.* ¶ 11; Exhibit 2 to Lambert Decl.)

The Board expressed interest in ExteNet's proposal and noted the lack of reliable wireless service in certain locations within the Village and the need for improved service. (Joint Stipulation of Facts ¶¶ 12–13.)  The Board asked ExteNet whether the coverage contour could be expanded to encompass more areas of the Village. (*Id.* ¶ 13.)  The police commissioner of the Village advised ExteNet representatives that the Village was having issues with 911 calls being inefficiently routed or dropped due to poor wireless service. (*Id.* ¶ 14.)  At the Village's request, ExteNet worked with Verizon to redesign the DAS network, expanding the coverage contour without increasing the number of nodes deployed. (*Id.* ¶ 16.)  In or around June 2018, Verizon approved the redesigned network. (*Id.*)

On January 3, 2019, ExteNet presented its application for a special exception permit[1] to the Board based on the Verizon approved redesign. (*Id.* ¶ 19.)  The presentation included a map of the expanded coverage contour, a map displaying the existing Verizon coverage, a map, prepared by ExteNet, showing the projected coverage post-installation, and information about each of the

---

[1]    "Unlike a variance, which gives permission to an owner to use property in a manner inconsistent with a local zoning ordinance, a special exception involves a use permitted by the zoning ordinance, but under stated conditions. . . . [E]ntitlement to a special exception permit is not a matter of right[, and c]ompliance with local ordinance standards must be shown before a special exception permit may be granted." *Franklin Donut Sys., LLC v. Wright*, 881 N.Y.S.2d 163, 165 (2d Dep't 2009).

thirty-one nodes. (*Id.* ¶ 20; Exhibit 4 to Lambert Decl.) ExteNet proposed using three existing wood poles, twenty-three replacement wood poles, four new stand-alone wood poles, and one new decorative metal pole (a streetlight) as the installation points for the nodes. (Lambert Decl. ¶ 42; Exhibit 4 to Lambert Decl.)

After the January 3, 2019 meeting and at the direction of Stephen Limmer, Esq., General Counsel to the Village (the "Village Attorney"), ExteNet filed its application for a special exception permit with the Village (the "First Application"). (Joint Stipulation of Facts ¶ 21.) In addition to the expanded coverage contour, the First Application incorporated alternative locations for four of the nodes that the Board had proposed at the January 3 meeting. (*Id.* ¶ 22.) Of the thirty-one nodes, five were proposed to be placed in Kennilworth, a privately owned area of homeowners known as the Kennilwood Owners Association ("KOA"). (Exhibit 4 to Lambert Decl.) At its March 7, 2019 meeting, the Board opened and closed the public hearing on the First Application and approved it unanimously. (Joint Stipulation of Facts ¶ 23; Exhibit 6 to Lambert Decl.)

ExteNet began deploying its equipment in or around August 2019. (Joint Stipulation of Facts ¶ 24.) On September 19, 2019, the Building Inspector of the Village issued a "special exception permit revocation and stop work order" on the grounds that the small cell installations were not in accordance with the

6

specifications submitted to and approved by the Village, and that the antenna model was different. (*Id.* ¶ 25; Exhibit 7 to Lambert Decl.) The revocation and stop work order directed ExteNet to remove the non-conforming small cell facilities immediately and stated that ExteNet must submit a new special exception permit to the Board to "install similar cell nodes and antennas or other wireless facilities." (Exhibit 7 to Lambert Decl.)

ExteNet voluntarily agreed to remove all equipment and discuss a way forward with the Village. (Joint Stipulation of Facts ¶ 26.) During these discussions, the Village advised ExteNet that there was significant public opposition to the deployment of small cells based, in large part, on concerns regarding the purported negative health impacts of 5G. (*Id.* ¶ 27.) At the Village's request, ExteNet provided studies and articles on the health impacts of RF exposure and the lack of evidence for health concerns about 5G. (*Id.* ¶ 28.) ExteNet also confirmed that its proposal was to install equipment that would transmit advanced 4G services, not 5G, and provided contact information of experts in the study of the impacts of non-ionizing radiation. (*Id.*)

In November 2019, ExteNet submitted another application for a special exception permit (the "Second Application") under the newly amended Village Code.[2] (*Id.* ¶ 29.) The Second

---

[2]     Section 161, Article XII of the Village Code, which is the section of the Village Code relevant to the instant case, was amended in March 2019 to include "provisions specific to small cell applications," and amended again in October

Application was substantially the same as the First Application that the Board had approved in March, with updated information regarding the new antenna model and some changes to the

---

2019 "to include certain public notice requirements."  (Lambert Decl. ¶¶ 51, 65.)

Section 161, as amended, imposes various requirements on small cell installations, including, but not limited to:

1. being "mounted on structures 50 feet or less in height, including their antennas," Article XII § 161-81(A)(1);
2. being "mounted on structures no more than 10% taller than other adjacent structures," id. § 161-81(A)(2);
3. "not extend[ing] existing structures on which they are located to a height of more than 50 feet or by more than 10%, whichever is greater," id. § 161-81(A)(3);
4. having antennas which are "no more than three cubic feet in volume," id. § 161-81(B);
5. being spaced and located "as to minimize the aesthetic impact upon nearby residential dwellings, taking into account property lines, driveways, topography, sight lines, water views, and existing landscaping," id. § 161-81(C)(1);
6. being placed "on existing structures with existing small wireless facilities" or "other existing structures" to the extent feasible, so long as there is no "material adverse aesthetic impact on nearby residential dwellings," id. §§ 161-81(C)(2), (3);
7. "[a]ll other wireless equipment associated with the structure[s on which the small cells are installed], including the wireless equipment associated with the antenna[s] and any preexisting associated equipment of the structure[s], [being] no more than 28 cubic feet in volume," id. § 161-81(D);
8. not "requir[ing] antenna structure registration pursuant to the rules adopted from time to time by the Federal Communications Commission," id. § 161-81(E);
9. not "result[ing] in human exposure to radio frequency radiation in excess of the applicable safety standards adopted from time to time by the Federal Communications Commission, id. § 161-81(F);
10. being "placed underground to the extent practicable," id. § 161-84(K);
11. a public hearing conducted by the Board, the notice of which "shall be published in the official newspaper of the Village and sent by the applicant . . . to all property owners within 600 feet of the location of all proposed small wireless facilities," id. §§ 161-91(B)(1), (2);
12. "a certification from a qualified engineer that the wireless facility will not emit a radiofrequency radiation or other frequency or transmission signal greater than approved by the Federal Communications Commission," id. § 161-91(B)(4);
13. "a current report from a qualified engineer or other professional acceptable to the Village as to all adverse health impacts from the proposed wireless facility," id. § 161-91(B)(5); and
14. "certificates of insurance in such forms and amounts as are then currently required for building permits for single-family dwellings within the Village, naming the Village of Kings Point, its officers and employees as additional insureds," id. § 161-91(B)(6).

8

installation sites.  (*Id.*)

The Village's review and processing of the Second Application effectively came to a halt with the onset of the Covid-19 pandemic.  (*Id.* ¶ 30.)  In July 2020, the Village advised ExteNet that it would accept a single complete copy of the Second Application that included the supplemental materials requested by the Village, instead of ExteNet providing the supplemental materials on a piecemeal basis.  (*Id.* ¶ 31; Exhibit 9 to Lambert Decl.)  On November 19, 2020, ExteNet delivered a complete copy of the Second Application to the Village.  (Joint Stipulation of Facts ¶ 32; Exhibit 11 to Lambert Decl.)  The Second Application proposed installing small cells on 22 existing utility poles, 4 replacement poles, and 5 new wood poles.  (Joint Stipulation of Facts ¶ 33; Exhibit 10 to Lambert Decl.)

On December 3, 2020, the Village notified ExteNet that the Second Application was incomplete, and identified certain clarifications and corrections that were required.  (Joint Stipulation of Facts ¶ 34; Exhibit 12 to Lambert Decl.)  In the letter notice, the Village advised that "[m]embers of the public have indicated more concern about the 5G network than the 4G network. If [ExteNet] is still proposing the 4G network, . . . it would be helpful to the public if it knew that in advance and it might eliminate some of their concerns and comments at the hearing, even if those concerns are not well-founded and may be irrelevant

to the Board's decision."   (Exhibit 12 to Lambert Decl.)

On February 1, 2021, ExteNet submitted the supplemental information requested by the Village, and on February 3, 2021, the Village notified ExteNet that it deemed the Second Application complete and that the "only issue" was scheduling a public hearing. (Joint Stipulation of Facts ¶ 35; Exhibit 13 to Lambert Decl.) The Village initially proposed scheduling the hearing in April, rather than March, in the hopes that more residents would be vaccinated by April.  (Joint Stipulation of Facts ¶ 36; Exhibit 13 to Lambert Decl.)   Subsequently, in April 2021, the Village requested, and ExteNet agreed to, a lengthy tolling agreement that would extend the Village's time to act under the shot clock[3] from April 1 to August 18, 2021.  (Joint Stipulation of Facts ¶ 37; Exhibit 14 to Lambert Decl.)

On April 7, 2021, the parties executed a tolling agreement, which provided that: (a) the Second Application was filed and received as of November 19, 2020; (b) the Second

---

[3]    The Federal Communications Commission ("FCC"), the federal agency charged with enforcing the TCA, has issued several declaratory orders that, *inter alia*, defined the "reasonable time" within which a local government must act on a wireless facility siting application under 47 U.S.C. § 332(c)(7)(B)(ii).  "The first of these orders implemented timing provisions called 'shot clocks.'" *ExteNet Systems, Inc. v. City of Cambridge*, 481 F. Supp. 3d 41, 50 (D. Mass. 2022).  The United States Supreme Court has held that the FCC's declaratory rulings regarding reasonable time periods for acting on siting applications are entitled to *Chevron* deference in *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013).  For small cells, "the relevant shot clocks are sixty days for collocation, which utilize existing infrastructure, and ninety days for other applications, which require new construction, unless the parties agree to toll the shot clocks." *City of Cambridge*, 481 F. Supp. 3d at 50–51.

Application was deemed complete as of February 1, 2021; (c) the Village was required to act on the Second Application by April 1, 2021; (d) the Village would hold a public hearing on the Second Application no later than July 23, 2021; (e) the parties agree to toll the shot clock until August 18, 2021; and (f) the Village was not requesting further information from ExteNet and could not request further information as a condition to voting on the Second Application. (Exhibit 14 to Lambert Decl.)

In late June 2021, the Village informed ExteNet that because of vacations, the next available date for a public hearing was August 24, past the date for final action set forth in the tolling agreement. (Joint Stipulation of Facts ¶ 39.) In early July, the Board asked ExteNet to evaluate alternatives for some of the proposed sites in light of requests from residents. (*Id.* ¶ 40.) On July 20, 2021, ExteNet's construction manager, Jim McGrath, and RF engineer, Chris Fridrich, held meetings with Village officials and residents and were able to identify alternative sites for two nodes that satisfied the residents. (*Id.* ¶ 41.) As for Node 10, however, which was to be installed 350 feet away and separated by dense tree cover from a residence, the parties could not find an alternative that satisfied its owners, who were primarily concerned with the antenna for Node 10 being at roughly the same height as their daughter's bedroom balcony. (*Id.* ¶¶ 42–43.) For approximately the following two weeks, further

11

attempts were made by ExteNet and Village officials to find alternatives, including increasing the height of Node 10, but they were unable to identify a solution that satisfied the owners of the residence. (*Id.* ¶ 44.)

On August 18, 2021, ExteNet and the Village amended the tolling agreement, affirming the terms of the original agreement and further tolling the shot clock until September 17, 2021. (*Id.* ¶ 45.) A public hearing on the Second Application was held during the August 24, 2021 Board meeting. (*Id.* ¶ 46.) Prior to the meeting, the Village Attorney confirmed that once the special exception permit was approved, other than the updated construction drawings for the two nodes ExteNet had recently agreed to move, the Village would not require anything further for ExteNet to commence construction. (*Id.* ¶ 47.)

At the public hearing, ExteNet gave a brief history of the application process and explained that ExteNet had expanded the coverage contour at the Board's request to ameliorate poor wireless service in the entire Village, and modified certain locations from the First Application to address resident or Board requests. (*Id.* ¶ 48.) ExteNet also presented: (1) a map of the current Verizon coverage; (2) a projected coverage map prepared by ExteNet displaying improved wireless service after the installation of the small cells; (3) information that RF emissions from its small cells are safe and well within federal limits; (4)

12

equipment specifications; and (5) photo simulations of the proposed installations. (Exhibit 19 to Lambert Decl.) Many resident comments at the hearing concerned the health impacts of RF emissions. (Joint Stipulation of Facts ¶ 50.) At the end of the meeting, the Board voted to close the public hearing and announced that it would discuss and deliberate on the Second Application as modified at its September 13, 2021 meeting. (*Id.* ¶ 51.)

After the August hearing, on August 26 and 27, 2021, ExteNet and Village officials met with additional residents to discuss their requests to relocate some of the other nodes. (*Id.* ¶ 52.) In some instances, ExteNet was able to identify an alternative that satisfied the resident; in others, the residents were dissatisfied with all feasible options. (*Id.* ¶ 53.)

In advance of the September 13, 2021 meeting, pursuant to the Board's request, ExteNet sent to the Village coverage and drive test maps that Verizon had provided to ExteNet. (Exhibit 21 to Lambert Decl.) On the day of the meeting, the Village Attorney, explaining that he would like to draft and circulate for the Board's review a proposed decision approving the Second Application, asked ExteNet to provide a copy of ExteNet's short form environmental assessment, identify the nodes that had been moved since its last formal application, and identify the nodes that were proposed to be installed on private roads owned by the

13

KOA. (Joint Stipulation of Facts ¶ 55; Lambert Decl. § 95; Exhibit 22 to Lambert Decl.) The Village Attorney prepared and sent to the Board a proposed draft resolution approving the Second Application. (Joint Stipulation of Facts ¶ 56.)

At the September 13 meeting, the Village Attorney and the Mayor provided a history of ExteNet's proposal and acknowledged that ExteNet had satisfied the requirements outlined in the Village Code. (*Id.* ¶ 57.) The Mayor also stated that ExteNet had worked with residents to address their concerns and discussed the public safety issues the Village faced due to poor wireless service. (*Id.* ¶ 58.) Then, without a motion to reopen the public hearing, which had closed at the August 24 meeting, the Board allowed public comment. (*Id.* ¶ 59.) A member of the KOA stated that the proposed sites for five of the nodes, though within the Village, are on private streets within the area known as Kennilworth, owned by the KOA, and the KOA never gave ExteNet permission to install the nodes on those streets. (*Id.* ¶ 60.)

Andrew Campanelli, Esq., who represents a group of residents that opposed the deployment of small cells but that did not include KOA residents, addressed the Board. (*Id.* ¶ 61.) Mr. Campanelli asserted that ExteNet had not demonstrated a need for its facilities and the coverage maps that ExteNet had provided to the Village may have been "doctored." (*Id.*) When the Board inquired into the claims made by Mr. Campanelli, some residents

14

began shouting at the Board, claiming they were "working" for ExteNet. (*Id.* ¶ 62.)

For approximately the next two hours, residents spoke in opposition to the Second Application. (*Id.* ¶ 63.) The resident comments were related to potential health effects, loss of property values, aesthetic concerns, unreliability of the coverage data provided by ExteNet, theories of 4G services being converted to 5G without anyone knowing, mistrust of the RF emissions reports provided by ExteNet, claims of having good service by residents who lived in close proximity to some of the proposed sites, and frustration that the Board had not retained a consultant to oppose the application. (*Id.* ¶ 63.) The Board did not find that loss of property values and adverse aesthetic impacts were bases for denying the application. (*Id.* ¶ 64.)

ExteNet's RF engineer, Chris Fridrich, addressed the claims regarding the coverage maps, stating that the coverage maps had been prepared by Verizon, were accurate, and had not been manipulated. (*Id.* ¶ 65.) Mr. Fridrich also presented the drive test maps[4] from Verizon. (*Id.* ¶ 66.) In response to requests for

---

[4]     A coverage map, by depicting signal strength levels over a given area, "demonstrate[s] how far and at what strength wireless signal propagates from cell sites in the area." (Fridrich Decl. ¶ 15 n.1.) The coverage maps at issue here were "derived from Verizon's proprietary and highly tuned propagation models, which are based upon years of collected drive test results and mobile transmi[ssion] data . . . ." (*Id.* ¶ 54.) Drive test maps display data collected from drive tests. A drive test is "[a] field test where an antenna is attached to a vehicle, which traverses roadways to collect [live] wireless network data." (Joint Stipulation of Facts, Terminology; Fridrich Decl. ¶ 46.)

the raw drive test data, Mr. Fridrich explained that the drive test maps present the raw data in graphical form and because the drive test data consists of thousands of individual data points obtained from on-the-ground drive tests, the drive test data is best viewed in graphical form.  (*Id.* ¶ 67.)  At the end of the meeting, the Board asked ExteNet to obtain the underlying data for the drive test maps from Verizon and provide it to the Board, and to allow the Board at least 30 days from the Board's receipt of the requested data to evaluate the underlying data before rendering a decision on the Second Application.  (*Id.* ¶ 68.)

On September 16, 2021, ExteNet's counsel submitted a letter to the Village further addressing, *inter alia*, the claims by Mr. Campanelli regarding drive test data.  (*Id.* ¶ 69; Exhibit 23 to Lambert Decl.)  ExteNet counsel explained again that the drive test maps provided to the Board displayed the raw drive test data in graphical form.  (Exhibit 23 to Lambert Decl.)  The letter also included legal argument regarding the limited scope of municipal authority over citing applications for wireless facilities.  (*Id.*)  ExteNet did not provide the underlying data for the drive test maps to the Village.  (Joint Stipulation of Facts ¶ 70.)  The Village did not retain an expert to analyze the coverage data submitted by ExteNet and did not conduct any independent testing.  (*Id.* ¶ 71.)

The Board did not issue a decision on the Second Application by September 17, 2021, the action date set forth in the parties' amended tolling agreement. (*Id.* ¶ 72.)  On September 30, 2021, the Board held a meeting and unanimously adopted a resolution denying the Second Application (the "Decision").  (*Id.* ¶ 74; Exhibit 24 to Lambert Decl.)  The Decision stated that the Board purposefully withheld rendering a decision by September 17, 2021, in order to sufficiently review and consider the letter from ExteNet's counsel, and to allow ExteNet time to provide the requested data.  (Exhibit 24 to Lambert Decl. at 10.)  The Decision also stated that the denial was without prejudice to ExteNet "filing a new application with sufficient information to show that a denial of the application would materially inhibit the provision of wireless services at the location of the then proposed Small Wireless Facilities."  (*Id.* at 11.)

According to the Decision, although the coverage maps submitted by ExteNet indicated substandard wireless service in the proposed installation sites, residents who live near the sites stated that they did not have substandard coverage.  (*Id.* at 6–7.)  Furthermore, the Board noted that Mr. Campanelli "alleged that Verizon's website shows more than substandard coverage for the four locations in close proximity to his clients."  (*Id.* at 7.)  Based on the foregoing, along with a certain FCC Staff Report, titled "Mobility Fund Phase II Coverage Maps Investigation,"

stating that coverage maps are not sufficiently accurate, the Board concluded that ExteNet had failed to make a sufficient showing of need for the small cells and further failed to show that denying its application "would materially inhibit wireless service in violation of federal law." (*Id.* at 8–9.)  With respect to the five nodes located within Kennilworth, the Board stated that ExteNet could not install the nodes at those locations without the consent of the KOA, and the Village could not issue permits for those nodes unless the consent is given by the KOA.  (*Id.* at 10.)

## CONCLUSIONS OF LAW

### I.   Intervention as of Right[5]

A proposed intervenor must satisfy four conditions to intervene as of right under Fed. R. Civ. P. 24(a)(2).  A party may only intervene as of right if the party: (1) files a timely motion; (2) asserts an interest relating to the property or transaction that is the subject of the action; (3) is so situated that without the intervention the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; and

---

[5]     The proposed intervenors assert that they have standing.  In *Town of Chester v. Laroe Estates, Inc.*, the Supreme Court held that an intervenor as of right under Rule 24(a)(2) "must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." 137 S. Ct. 1645, 1651 (2017).  This Court held previously in *Cross Sound Cable Co., LLC v. Long Island Lighting Co.*, No. 21-cv-2771(KAM), 2022 WL 247996, at *8 (E.D.N.Y. Jan. 27, 2022), that a permissive intervenor, too, must demonstrate standing to seek relief that is different than the relief sought by the named parties.   Here, because the proposed intervenors have not established the requirements for intervention as of right or permissive intervention, the Court need not, and therefore does not, address whether they have standing.

18

4) has an interest not adequately represented by other parties.
*United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994).
"Failure to satisfy *any one* of these requirements is a sufficient
ground to deny [intervention]." *Catanzano v. Wing*, 103 F.3d 223,
232 (2d Cir. 1996) (emphasis in original) (citing *Farmland Dairies
v. Comm'r of N.Y. State Dep't of Agric. & Mkts.*, 847 F.2d 1038,
1043 (2d Cir. 1988)).

The proposed intervenors claim that they have a
protectable property interest that may be impaired by a judgment
in ExteNet's favor and cannot be adequately protected by the
Village. (ECF No. 24, Memorandum of Law In Support of Motion for
Intervention ("Intervention Br."), at 7–12.) The Court finds that
though the proposed intervenors timely filed their motion, they
cannot satisfy the remaining three conditions for intervention as
of right.

**A.   Timeliness of the Motion**

"A district court has broad discretion in assessing the
timeliness of a motion to intervene, which 'defies precise
definition.'" *In re Holocaust Victim Assets Litig.*, 225 F.3d 191,
198 (2d Cir. 2000) (quoting *Pitney Bowes, Inc.*, 25 F.3d at 70).
Factors considered in determining the timeliness of a motion to
intervene include: "how long the motion to intervene was delayed,
whether the existing parties were prejudiced by that delay, whether
the movant will be prejudiced if the motion is denied, and unusual

19

circumstances militating either for or against a finding of timeliness." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001) (citing *Pitney Bowes, Inc.*, 25 F.3d at 70). Though these four factors are used as a guide, whether a motion to intervene is timely must be "evaluated against the totality of the circumstances before the court." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) (citation omitted). "Among the most important factors in a timeliness decision is 'the length of time the applicant knew or should have known of his interest before making the motion.'" *Catanzano*, 103 F.3d at 232 (citation omitted).

"Rule 24(a) requires courts to measure timeliness from the moment when the applicant had actual or constructive notice of its unrepresented interest." *Floyd v. City of New York*, 302 F.R.D. 69, 86 (S.D.N.Y. 2014). The instant action was filed on October 15, 2021, and the "proposed motion to intervene"[6] was filed on January 3, 2022. (*See* ECF No. 12.) In a declaration filed in support of the motion to intervene, counsel for the proposed intervenors, Mr. Campanelli, states that the proposed intervenors "learn[ed] of the existence of this matter . . . through 'word of mouth,'" but does not specify when they first had notice. (ECF

---

[6]   Though the "proposed motion to intervene" was not filed in compliance with the Court's Individual Rules, the Court finds that the parties were notified of the proposed intervenors' intent to seek intervention as of January 3, 2022.

No. 23, Declaration of Andrew Campanelli ("Campanelli Decl."), at 8.)

Though it is not certain when the proposed intervenors had actual notice of the instant action, the earliest they would have been on notice is October 15, 2021, when the Complaint was filed.  The motion to intervene was filed less than three months thereafter.  This relatively brief period between notice and the filing of the motion, as well as the early stage of the litigation, support a finding that the motion was timely and did not cause a delay.  Accordingly, the Court finds that the motion to intervene was timely filed.  *See ExteNet Systems, Inc. v. Vill. of Lake Success*, No. 19-cv-3471(LDH), 2020 WL 1862948, at *2 (E.D.N.Y. Feb. 21, 2020) (finding that the motion to intervene, filed approximately two months after the filing of the complaint, was timely), *R. & R. adopted* (Order dated Mar. 30, 2020).

## B.   Interest Relating to the Property or Transaction that is the Subject of the Action

The proposed intervenors assert that they possess "substantial interests" in the small cells which are the subject of the instant action.  (Intervention Br. at 10.)  In support, they submitted what they refer to as "direct probative evidence" of their substantial interests, namely, letters from certain real estate brokers from the area opining that the installation of small cells in close proximity to the proposed intervenors' homes would

21

result in "substantial losses in monetary value." (Intervention Br. at 9–10; Exhibit D to Campanelli Decl.) Specifically, the brokers claim that the homes will lose value by ten to twenty-five percent and will stay in the market for substantially longer because fewer buyers are interested in homes located near wireless facilities. (Exhibit D to Campanelli Decl. at 20–29.) Also submitted are letters from some of the proposed intervenors to the Board stating that the installation of the small cells will impact their standard of living and destroy their ability to enjoy their homes. (*Id.* at 14–18.)

Notably, other than the number of years of experience of the brokers who authored the letters, no evidentiary support is given for the conclusory assertions that the market value of the proposed intervenors' homes will decrease by as much as twenty-five percent. No supporting data, not even a single example of a home that declined in value as a result of the installation of a small cell in "close proximity,"[7] is proffered.[8] Accordingly, the

[7] Though the proposed intervenors claim that the proposed installation sites are in "unreasonably close proximity" to their homes, (Intervention Br. at 1), Plaintiff, as part of its opposition to the intervention motion, submitted exhibits showing that the proposed nodes would be located as follows: Node 4 would be located 208 feet from the closest point of the Roubeni residence, Node 8 would be located 300 feet from the closest point of the Noghreh residence, Node 10 would be located 350 feet from the closest point of the Tali Damaghi and family residence, and Node 28 would be located 150 feet from the closest point of the Honey Damaghi and family residence and 120 feet from the closet point of their pool area. (ECF No. 26-1–26-4, Exhibits 1 to 4 to the Declaration of Christian Fridrich.)
[8] The news article and "professional studies" referenced in the proposed intervenors' proposed memorandum of law in opposition to ExteNet's motion for preliminary injunction relate to the effect that installation of macro-cellular towers exceeding 100 feet have on the value of nearby residential properties,

Court concludes that the brokers' unsupported assertions do not support a finding that the proposed intervenors' homes will suffer substantial, or any, losses in monetary value as a result of the proposed small cells being located over 100 feet away. *See Vill. of Lake Success*, 2020 WL 1862948, at *1 (holding that the non-party village residents who moved to intervene, arguing that installing small cells near their homes "would decrease the value of their property and have an adverse aesthetic impact" have no cognizable interest relating to the property or transaction that is the subject of the action).

The proposed intervenors' aesthetic impact argument fares no better. *See Omnipoint Commc'ns, Inc. v. City of White Plains*, 202 F.R.D. 402, 403 (S.D.N.Y. 2001) (denying owner of property adjacent to proposed site for wireless facility leave to intervene, holding that the property owner that claimed that the facility "will ruin the view from its sanctuary" did not have a protectable interest in the subject or property of the action).

More critically, the proposed intervenors do not have a cognizable interest relating to the property or transaction that is the subject of this action. The property at issue consists of thirty-one small cell sites within the Village and ExteNet's

---

and not small cell nodes. (ECF No. 23-2, Proposed Intervenors' Proposed Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Proposed Opposition"), at 14 n.8.) Macro-cellular towers are not at issue here.

23

application for a special exception permit, which do not belong to the proposed intervenors.[9]   This point is not disputed.   (*See* Intervention Br. at 4 ("Upon learning that four of the DAS Nodes *ExteNet* was seeking to construct were to be installed in extremely *close proximity* to their respective homes . . . .") (second emphasis added).)   Furthermore, the transaction at issue is the Village's disposition of ExteNet's application for a special exception permit.   The proposed intervenors do not have a cognizable interest in the properties or in ExteNet's application.

### C.   Proposed Intervenors' Ability to Protect Their Interests

Furthermore, the disposition of the instant action will not impair or impede the proposed intervenors' ability to assert their interests.   *See Vill. of Lake Success*, 2020 WL 1862948, at *3 ("Moreover, disposition of the questions before the court . . . will not impair the [adjacent landowners'] ability to take practical steps to vindicate their interests.   It remains their prerogative to engage in the Village's governance procedures to advocate against granting [ExteNet's] application and, if unsuccessful, to mount their own legal challenge to any decision allowing [ExteNet] to install the nodes.").   *See also Drago v. Garment*, 691 F. Supp. 2d 490, 496 (S.D.N.Y. 2010) (holding that

---

[9]      The four proposed sites (for Nodes 4 8, 10, and 28) that the proposed intervenors oppose are distinct from the proposed sites (for Nodes 5, 6, 9, 15, and 17) located on private roads owned by the KOA.   (*See* Intervention Br. at 4 n.1; Nejat Decl. ¶ 7.)   The group of proposed intervenors does not include resident members of the KOA.

the TCA does not provide a private right of action to persons adversely affected by a local zoning board's decision to allow the construction of a wireless cell antenna, reasoning, *inter alia*, that "[c]onstruing the right of action in § 332(c)(7) as [p]laintiff proposes would infringe upon state and local control over zoning matters by converting suits that should happen in state court into federal actions.") (citing Article 78, N.Y. Civ. Prac. L. R (governing challenges to New York state and local instrumentalities)).

**D.    Adequate Representation by the Village**

Finally, any interests that the proposed intervenors may have will be adequately represented by the Village. Even if the proposed intervenors and the Village do not share an interest relating to the property or transaction that is the subject of the action, they share "an identity of interest" in the outcome; both agree that the Village's denial of ExteNet's application was proper, and share the same objective, the denial of ExteNet's motion for injunctive relief and dismissal of ExteNet's claims. *See N.Y. SMSA Ltd. P'ship v. Town of Philipstown*, No. 18-cv-1534(VB), 2018 WL 6619737, at *2 (S.D.N.Y. Dec. 18, 2018). And where, as here, a proposed intervenor shares an identity of interest in the outcome with an existing party, the proposed intervenor must overcome the presumption that the party already in the action adequately represents that interest. *Vill. of Lake*

25

*Success*, 2020 WL 1862948, at *3.  To overcome the presumption, the proposed intervenor may offer "evidence of collusion, adversity of interest, nonfeasance, or incompetence" by the existing party sharing the same interest.  *Id.* (citation omitted).

The proposed intervenors do not assert that the Village has participated in collusion, exhibited nonfeasance, or acted with incompetence.  The only argument proffered is that the Village may "resolve this case through mediation or settlement." (Intervention Br. at 12.)  However, "[t]he mere possibility of settlement does not alone render the [Village's] and the proposed intervenors' interests adverse."  *Town of Philipstown*, 2018 WL 6619737, at *2.  And the proposed intervenors point to no other facts or circumstances that suggest that the Village will not adequately protect their interests in opposing ExteNet's claims.[10] For the reasons set forth above, the proposed intervenors have not established a right to intervene.

---

[10]    In support of their motion, the proposed intervenors rely on the letter from the Village advising the Court that the Village does not oppose the motion to intervene, (ECF No. 25), and argue that the Village cannot adequately represent their interests.  (ECF No. 28, Proposed Intervenors' Reply In Support of Motion for Intervention ("Intervention Reply"), at 1.)  Notably, the Village asserts vaguely that the proposed intervenors have an interest that differs "from the interests of the community at large," without any explanation as to how their interests are different in the context of a case where both seek the same outcome.  (ECF No. 25.)

## II.  Permissive Intervention

The proposed intervenors also move for permissive intervention.  Rule 24(b)(1)(B) provides that on timely motion, the Court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact.  Fed. R. Civ. P. 24(b)(1)(B).  Permissive intervention lies within the Court's "broad discretion." *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 561 (2d Cir. 2005).  *See also Floyd v. City of New York*, 770 F.3d 1051, 1062 n.38 (2d Cir. 2014) (observing that a denial of permissive intervention "has virtually never been reversed") (quoting *Catanzano*, 103 F.3d at 234).

"In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(c), a concern raised by ExteNet who seeks an injunction.  (ECF No. 26-7, Plaintiff's Memorandum of Law in Opposition to Motion for Intervention at 7–8.)  The court also considers factors such as the nature and extent of the intervenors' interests, whether their interests are adequately represented by the other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented. *Vill. of Lake Success*, 2020 WL 1862948, at *4.

For the reasons herein, the Court exercises its discretion to deny permissive intervention in this case. As discussed *supra*, the Village and the proposed intervenors share an identity of interest in the denial of ExteNet's application; thus, the Village can adequately protect any interests the proposed intervenors may possess. In addition, the proposed intervenors "do not propose to bring anything new to the table." *Id.* at *3. Based on its review of the proposed intervenors' Proposed Answer, (ECF No. 23-2), and their Proposed Memorandum of Law in Opposition to ExteNet's Motion for Preliminary Injunction, (ECF No. 23-2, Proposed Opposition), the Court finds that the proposed intervenors have not shown that their intervention would significantly contribute to the underlying relevant factual issues or to the just and equitable adjudication of the legal issues.

First, the proposed intervenors' opposition rehashes arguments already advanced by the Village in its opposition to ExteNet's motion for preliminary injunction, for example, that ExteNet failed to demonstrate need for the small cells. In addition, the issues before the Court on ExteNet's motion for preliminary injunction are whether the Board's denial of the application was based on substantial evidence, or prohibited or had the effect of prohibiting the provision of personal wireless service. The proposed intervenors argue that the application, which the Village has already denied, should also be denied due to

aesthetic and valuation considerations, but the Board expressly stated it did not rely on such grounds in reaching its decision.[11] The proposed intervenors even advocate for considerations that were not before the Board and not part of the written record, such as 47 U.S.C. § 1455(a) allowing modifications to existing wireless facilities without approval from the Board. (Proposed Opposition at 19–20.) Thus, the proposed intervenors will not contribute to relevant factual issues or the just adjudication of legal issues because the Village has already advanced the same arguments or has explained why the issues are not properly considered in deciding ExteNet's application for a special exception permit.

Finally, allowing the intervention of the proposed intervenors would delay "the adjudication of the original parties' rights in this case, which Congress directs must be heard and decided on an expedited basis." *N.Y. SMSA Ltd. P'ship v. Town of Bedford*, No. 21-cv-3742(PMH), 2022 WL 718641, at *3 (S.D.N.Y. Mar. 10, 2022) (internal quotation marks and citations omitted).

---

[11]   (*See* Proposed Opposition at 14 ("In addition to the adverse impacts upon the aesthetics and residential character of the area at issue, the irresponsible placement of such unnecessary wireless facilities in such close proximity to nearby residential homes would contemporaneously inflict upon such homes a severe adverse impact upon the actual value of those residential properties."); Exhibit 24 to Lambert Decl. at 7–8 ("The FCC has precluded this Board from denying the application because of any alleged adverse health impacts from the radio frequency emissions from the Facilities.  The FCC has precluded this Board from denying the application because of aesthetic concerns if it would materially inhibit the wireless service.  This Board finds that, despite its concerns on behalf of the residents, the application, specifically for Small Wireless Facilities, cannot legally be denied because of alleged impacts on property values.").)

Accordingly, the proposed intervenors' motion to intervene is respectfully denied.

**III. The Preliminary Injunction Standard**

"A party seeking to obtain a preliminary injunction ordinarily must establish that absent award of the injunction it will suffer irreparable harm and must demonstrate either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor." *Sprint Spectrum, L.P. v. Mills*, 65 F. Supp. 2d 148, 160 (S.D.N.Y. 1999).

Where, as here, the injunctive relief sought is a mandatory injunction, or an injunction that "alters the status quo by commanding a positive act," the movant must meet the higher standard of "mak[ing] a clear or substantial showing of a likelihood of success on the merits." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006) (citation omitted) (internal quotation marks omitted). Here, ExteNet seeks an Order compelling the Village to issue the special exception permit for the deployment of small cells. ExteNet seeks a mandatory injunction because granting the injunction would alter, not preserve, the status quo, as the Village would be required to grant the special exception permit and allow the small cells to be

30

installed.   Therefore, ExteNet must make a "clear or substantial showing of likelihood of success on the merits."  *Id.*

### A.   Irreparable Harm

ExteNet argues that "a preliminary injunction directing the issuance of permits is appropriate" upon a sufficient showing of likelihood of success "because where an application to deploy a wireless facility is improperly denied[,] an applicant necessarily suffers irreparable harm in that (a) it is prevented from providing service, which is an unquantifiable harm, and (b) it cannot be awarded monetary damages."  (Pl. Br. at 6.)

In *Mills*, plaintiff argued that it had suffered "immeasurable economic harm to its business operation" due to defendant's denial of its application for permits to install a telecommunications facility and would "continue to suffer such harm if forced to delay the implementation of the [personal communication services] network."  65 F. Supp. at 160.  The court found irreparable harm and granted plaintiff's motion for preliminary injunction, reasoning that though it does not have "the ability at this point to ascertain the extent of the damage to [plaintiff] (if any) caused by [defendant's] denial of its application . . . allowing the denial to stand would be inconsistent with the policies underlying the [TCA]—i.e., insuring the speedy deployment of wireless services to the public . . . ." *Id.* at 161.

Likewise, here, the "interim damages" suffered by ExteNet as a result of the Village's denial of its application for a special permit "cannot be calculated with sufficient accuracy to make damages an adequate substitute." *Luce v. Edelstein*, No. 85-cv-4064(RLC), 1985 WL 2257, at *3 (S.D.N.Y. Aug. 8, 1985). It has been nearly five years since ExteNet contacted the Board for the first time regarding its proposal to install a small cell DAS network in the Village. Thus, for a long period of time, ExteNet has suffered, and will continue to suffer an indeterminate harm from being delayed and prevented by the Village from installing its wireless facilities, which harm cannot be accurately remedied through money damages.

Furthermore, "[c]ourts have consistently found that a mandatory injunction is an appropriate remedy for violations of the TCA." *Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Plan. Bd.*, 302 F. Supp. 2d 205, 225 (S.D.N.Y. Jan. 16, 2004) (internal quotation marks and citation omitted). *See also Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999) (finding that the TCA does not specify a remedy for violations and that a majority of district courts have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits). Accordingly, the Court finds that ExteNet has made a sufficient showing of irreparable harm.

**B.    Clear and Substantial Showing of Likelihood of Success**

    **1.    The Telecommunications Act**

The TCA, 47 U.S.C. § 151 *et seq.*, is "an omnibus overhaul of the federal regulation of communications companies," the purpose of which is "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition . . . ." *Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 637 (2d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 124).

In furtherance of this purpose, Congress, while preserving the authority of state and local governments over "decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A), imposed certain limitations over such authority. *Willoth*, 176 F.3d at 639; 47 U.S.C. § 332(c)(7)(B). These limitations proscribe local governments from, among others, taking actions that "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). In addition, the TCA requires that any denial of a request to construct a wireless facility be "in writing and supported by substantial evidence" in the record. *Id.* §

33

332(c)(7)(B)(iii).

When evaluating whether the Village's denial was supported by substantial evidence, the record should be reviewed in its entirety, including opposing evidence. *Cellular Tel. Co.*, 166 F.3d at 494 (citing *Am. Textile Mfr. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981)). "Substantial evidence, in the usual context, has been construed to mean less than a preponderance, but more than a scintilla of evidence. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

## 2. **Local and State Laws**

"[L]ocal and state zoning laws govern the weight to be given the evidence" supporting a decision by a local government to deny an application to construct personal wireless service facilities. *Id.* In other words, the TCA governs the "procedural requirements that local boards must comply with in evaluating" applications for personal wireless service facilities, but the applicable substantive standards are the "established principles of state and local law." *Id. See Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of East Fishkill*, 84 F. Supp. 3d 274, 295 (S.D.N.Y. 2015), *aff'd*, 632 F. App'x 1 (2d Cir. 2015) ("Here, the applicable local law is the Code, which sets forth the requirements for obtaining a special permit to construct a new telecommunications facility. State law, in turn, provides that wireless providers

34

are public utilities for the purposes of zoning applications.").

In the instant case, the applicable local law is section 161, Article XII of the Village Code, as amended in March and October 2019, which sets forth the procedural requirements for permitting small cells in the Village, and defines small cells and provides equipment and siting specifications that must be met. The Village does not dispute that ExteNet has satisfied the requirements under the Village Code for a special exception permit to install small cells in the Village.  Indeed, the Village has stipulated that the Village Attorney and the Mayor stated at the September 13, 2021 Board meeting that "ExteNet had satisfied the requirements outlined in the Village Code."  (Joint Stipulation of Facts ¶ 57.)

With respect to the applicable state law, wireless carriers are classified as public utilities under New York law for purposes of zoning applications.  *Cellular Tel. Co. v. Rosenberg*, 624 N.E.2d 990, 993 (N.Y. 1993).  Accordingly, "a narrower range of discretion" is involved "in dealing with special permit applications filed by utilities than is true in the case of the generality of applications."  *T-Mobile Ne. LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 265 (E.D.N.Y. 2011) (citation omitted). "Rather than granting a variance only on a showing of 'unnecessary hardship,' a local zoning board must consider whether the public utility has shown 'a need for its facilities' and whether the needs

of the broader public would be served by granting the variance." *Cellular Tel. Co.*, 166 F.3d at 494 (citing *Consol. Edison Co. v. Hoff*man, 374 N.E.2d 105 (N.Y. 1978)).[12]

In the context of zoning decisions for telecommunications facilities, the public necessity standard set forth in *Consolidated Edison* has been interpreted as requiring that a telecommunications provider seeking a variance for a proposed facility establish that: (1) "there are gaps in service," (2) "the location of the proposed facility will remedy those gaps," and (3) "the facility presents a minimal intrusion on the community." *N.Y. SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d 143, 154 (E.D.N.Y. 2011) (citation omitted).

---

[12] "ExteNet contracts with FCC-licensed wireless providers to design, obtain local permits for, build, and operate small cell networks in areas that the carrier has identified as needing improved service." (Lambert Decl. ¶ 13.) Some courts in this Circuit have applied the public utility standard set forth in *Consolidated Edison* to zoning applications made by entities that develop and build telecommunications facilities on behalf of telecommunications carriers licensed by the FCC, without clarifying whether they, too, qualify as public utilities. *See, e.g., ExteNet Systems, Inc. v. Vill. of Plandome*, No. 19-cv-7054(GRB), 2021 WL 4449453, at *15 (E.D.N.Y. Sept. 29, 2021); *Up State Tower Co., LLC v. Town of Kiantone*, No. 16-cv-69(MAT), 2019 WL 1117220, at *3 (W.D.N.Y. Mar. 11, 2019). In *Rosenberg*, the New York Court of Appeals held that a telecommunications carrier is a public utility and that an antenna tower that facilitates the supply of telecommunications service is a "public utility building," reasoning that a telecommunications carrier possesses the characteristics of a public utility. 624 N.E.2d at 993. These characteristics include: (1) providing services essential to the public interest; (2) operating "under a franchise, subject to some measure of public regulation"; and (3) having logistical problems, such as having to pipe, wire, or otherwise serve the product of the utility to each user and "maintain[ the supply] at a constant level to meet minute-by-minute need," and the "user ha[ving] no alternative source" and "the supplier commonly ha[ving] no alternative means of delivery." *Id.* The same rationale applies to entities like ExteNet that contract with FCC-licensed carriers to construct the facilities needed to provide telecommunications services, whether it be via macro-cellular towers or small cells, that the carriers themselves would otherwise put into place.

Here, however, ExteNet is not seeking a variance but instead seeks a special exception permit. Thus, ExteNet contends that it was not required to demonstrate a public necessity because the Village legislated a special exception permit process for the siting and construction of small cells. ExteNet argues that, under New York law, legislating a special exception permit "for a particular use is 'tantamount to a finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood,'" unlike a variance, which permits a use that is inconsistent with the local zoning. (ECF No. 17-38, Plaintiff's Memorandum of Law in Support of its Motion for a Preliminary Injunction ("Pl. Br."), at 8 (quoting *N. Shore Steak House, Inc. v. Bd. of Appeals of Inc. Vill. of Thomaston*, 282 N.E.2d 606, 609 (N.Y. 1972)).) According to ExteNet, "[b]ecause the Village Code permits, not prohibits, small cells as a form of infrastructure in the community," ExteNet was not required to make a showing of public need for them. Instead, ExteNet contends that it has demonstrated its compliance with the requirements set forth in the Village Code. (Pl. Br. at 8.) Indeed, the Village, through its mayor and attorney, has conceded that ExteNet has complied with the Village Code permit requirements. (Joint Stipulation of Facts ¶ 57.)

In support, ExteNet cites to New York Court of Appeals decisions distinguishing variances and special exceptions and holding that a property owner seeking a special exception permit, as opposed to a variance, need not show an undue hardship. *See id.* (citing *In re Retail Prop. Tr. v. Bd. of Zoning Appeals of Town of Hempstead*, 774 N.E.2d 727, 730–31 (N.Y. 2002) ("Unlike a variance which gives permission to an owner to use property in a manner inconsistent with a local zoning ordinance, a special exception gives permission to use property in a way that is consistent with the zoning ordinance, although not necessarily allowed as of right.  The significance of this distinction is that the 'inclusion of the permitted use in the ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood.'  Thus, the burden of proof on an owner seeking a special exception is lighter than that on an owner seeking a variance, the former only being required to show compliance with any legislatively imposed conditions on an otherwise permitted use, while the latter must show an undue hardship in complying with the ordinance.")).

ExteNet is correct that the Village Code explicitly prescribes the procedural requirements for obtaining a special exception permit for the siting and construction of small cells, and thereby specifically has legislated small cells as a permitted

38

use that is in harmony with the Village's general zoning plan. ExteNet's argument is persuasive, considering that the *Consolidated Edison* decision refers specifically to variances and public utilities having to show public necessity rather than undue hardship, which is a requisite showing for variances only, as clarified in *In re Retail Prop. Tr.*, 774 N.E.2d at 730–31. Furthermore, to apply the public necessity standard to special exception permits and variances alike would render the two without any difference.

At the same time, the Court notes that ExteNet does not cite to, nor is the Court aware of, New York cases holding that a public utility seeking a special exception permit is exempt from demonstrating public necessity. *Cf. Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 154–55 (applying New York's public necessity standard in analyzing defendants' denial of plaintiff telecommunications carrier's application for a special use permit, the requirements for which were set forth in the village code); *T-Mobile Ne. LLC v. Town of Islip*, 893 F. Supp. 2d 338 (E.D.N.Y. 2012) (same). The Court, however, need not and therefore does not reach this issue, as ExteNet has satisfied the *Consolidated Edison* standard and thus has made a sufficient showing of public necessity for the small cells.

### 3. Lack of Substantial Evidence for the Board's Decision

The Board's denial of the Second Application was based on its finding that ExteNet failed to demonstrate a need for the small cells and did not make a sufficient showing that a denial of the application would materially inhibit wireless service in violation of federal law.  (Exhibit 24 to Lambert Decl. at 6—9.) In addition, the Board concluded that the Village could not permit the siting of nodes within Kenilworth unless consent was granted to ExteNet by the KOA.  (*Id.* at 10.)

"As a general rule, if the public utility makes the required showing [of public necessity], which necessarily means the record is devoid of substantial evidence to support a denial, the variance must issue." *Town of Islip*, 893 F. Supp. 2d at 355). ExteNet submitted evidence that (1) there were gaps in Verizon's coverage, (2) the installation of small cells would remedy those gaps, and (3) the installation would be a minimal intrusion on the community. *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 154 (citation omitted).  The Board's finding that ExteNet failed to demonstrate need, as well as the reasons provided in support of that finding, are not substantiated by the record.  Not only is the Board's finding that ExteNet failed to demonstrate need contradicted by the evidence submitted by ExteNet of coverage gaps within the Village, but it is also inconsistent with the Board's

40

own statements regarding the Village's need for improved wireless service.  The parties' Joint Stipulation of Facts references several instances of the Board stating that the Village had unreliable wireless service.  (Joint Stipulation of Facts ¶¶ 12–13, 58.)  Moreover, it was the Board that had initially asked ExteNet to expand the coverage contour to encompass more parts of the Village.  (*Id.* ¶ 13.)

> a.  **The Proposed Facilities Would Remedy the Existing Gaps in Service**

ExteNet has established and the Village acknowledged that there were coverage gaps within the coverage contour.  "There is a public necessity when there is a service gap for a particular provider in a particular service area."  *Nextel of N.Y., Inc. v. City of Mount Vernon*, 361 F. Supp. 2d 336, 341 (S.D.N.Y. 2005).  As part of the Second Application, ExteNet submitted coverage and drive test maps that had been provided by Verizon, showing gaps in coverage.  (Fridrich Decl. ¶ 44.)  The coverage maps displayed poor signal strength within the coverage contour, with one map showing the signal strength of the 700 MHz frequency and the other of the Advanced Wireless Services frequency band.  (*Id.* ¶¶ 55, 57; Exhibit 3 to Fridrich Decl. at 8–9.)  The drive test maps, which display collected live network data, showed unreliable signal strength, active and idle network connectivity, and download speeds in and around Kings Point. (Fridrich Decl. ¶¶ 46–52; Exhibit

3 Fridrich Decl. at 4–7.)   ExteNet also presented testimony from its RF Engineer, Chris Fridrich, explaining the maps from Verizon and the need for improved service in the community.   (Fridrich Decl. ¶ 37; Lambert Decl. ¶¶ 88, 107.)   Mr. Fridrich also provided a predictive coverage map that he had developed that displayed the improved coverage the small cells would provide, (Fridrich Decl. ¶ 37; Lambert Decl. ¶ 88), thereby satisfying the second requirement of showing that the proposed facilities would remedy the existing gaps in service.   *Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 154.

In denying the Second Application, the Board found that ExteNet failed to demonstrate need for the small cells.   (Exhibit 24 to Lambert Decl. at 7.)   The Board's finding that ExteNet failed to show public necessity was not supported by substantial evidence in the record.   Instead, such finding was based on: (1) anecdotal comments from residents that "they did not have substandard coverage," (2) Mr. Campanelli's unsupported opinion that a map on Verizon's website showed "more than substandard coverage" for the four proposed sites near his clients' residences, and (3) ExteNet's rejection of the Board's request for the underlying data for the drive test maps.   (*Id.* at 6–9.)

The Court addresses each of the reasons given by the Board to determine whether its finding that ExteNet failed to demonstrate public necessity was based on substantial evidence.

42

First, the comments from certain residents as to the adequacy of service, and the information available on Verizon's website are outweighed by the tested evidence in ExteNet's favor.  Courts have found, and this Court agrees, that comments from residents that their service was adequate do not constitute substantial evidence. *See Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 160-162 (holding that "unverified, untested, anecdotal statements by Board members and residents about their personal coverage experience" are "not enough to call into question Verizon's otherwise undisputed objective evidence"); *N.Y. SMSA Ltd. P'ship v. Town of Oyster Bay*, No. 11-cv-3077(MKB), 2013 WL 4495183, at *13 n.6 (E.D.N.Y. Aug. 16, 2013) ("There was testimony by several of the community members that they did not experience any problems with their Verizon Wireless coverage.  This is not substantial evidence upon which the Board may rely to reject expert evidence to the contrary.") (citations omitted); *Industrial Commc'ns & Elecs, Inc. v. O'Rourke*, 582 F. Supp.2d 103, 108-09 (D. Mass. 2008) (holding that the opinion of seven neighbors that they have "good cellphone coverage" was "not enough to call into question the studies presented by [the plaintiff]").  Likewise, a marketing map on Verizon's website containing an express disclaimer related to the accuracy of its coverage information does not constitute reliable, much less substantial, evidence on which the Board could base its finding of adequate wireless service. *See Vill. of Plandome*, 2021

43

WL 4449453, at *16 (holding that coverage maps displayed on Verizon's website, with the express warning that these maps "are not a guarantee of coverage and contain areas of no service, and are a general prediction of where rates apply based on [Verizon's] internal data," "barely amount to even a 'scintilla' of evidence.").

The Village Board's third rationale for its finding that ExteNet failed to establish need is based on its view that ExteNet did not submit the underlying data for the drive test maps. The Village, citing to an FCC Staff Report,[13] argues that the coverage maps are not reliable because, according to the FCC Staff Report, they do not always accurately represent the actual data. (Exhibit 24 to Lambert Decl. at 8; ECF No. 18-1, Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Def. Opp."), at 3.[14]) In addition, the Village contends that the maps "do not show the data for all of the proposed locations for the [small cells], and, therefore, are insufficient, in and of themselves, to support the alleged gaps and the need for

---

[13]    This FCC Staff Report, titled "Mobility Fund Phase II Coverage Maps Investigation," was submitted as Exhibit D to the Declaration of Michael Kalnick.  (Exhibit D to Kalnick Decl.)
[14]    The Court clarifies that the Village mistakenly does not distinguish between "coverage maps" and "drive test maps" as ExteNet correctly does.  The Village instead refers to both as "coverage maps."  (*Compare* Fridrich Decl. ¶¶ 47–58 (referring to the first four maps in Exhibit 3 to the Declaration of Christian Fridrich as the "drive test maps" and referring to the fifth and sixth maps as the "coverage maps") *with* Def. Opp. at 5 (referring to the first map in Exhibit 2 to the Complaint, consisting of the same six maps in Exhibit 3 to the Declaration of Christian Fridrich, as a "coverage map").)  As explained in footnote 4, *supra*, drive test maps and coverage maps are distinct.

44

all of the Facilities." (Exhibit 24 to Lambert Decl. at 9; *see also* Def. Opp. at 5.) According to the Village, the drive test maps do not display network information in the area of the Village north of Redbrook Road and Middle Neck Road, where ExteNet proposed to deploy 19 of the 31 small cells. (Exhibit F to Kalnick Decl.).

First, the FCC Staff Report does not appear to be relevant to local permitting for small cells because it relates to the FCC's provision of universal service funding to providers to subsidize telecommunications service in, among others, low-income households and high-cost areas. (*See* Exhibit D to Kalnick Decl. at 1; FCC, https://www.fcc.gov/general/universal-service-fund (last visited May 6, 2022.) Furthermore, even if the Staff Report were applicable, its finding that coverage maps are not accurate because they "*overstate*[] . . . actual coverage," and "d[o] not reflect on-the-ground performance in many instances," does not support the Village's position that, notwithstanding the coverage and drive test maps from Verizon displaying substandard coverage, the Village actually has good wireless service. (Exhibit D to Kalnick Decl. at 2 (emphasis added).) Second, though the Village may be correct that the drive test maps, alone, are not enough to show deficiency in service as to the nineteen locations north of Redbrook Road and Middle Neck Road, the drive test maps and the coverage maps displaying poor signal strength within the entire coverage contour, together, are sufficient to demonstrate need.

45

Moreover, where, as here, the Village Code does not require a showing of a coverage deficiency by a specific type of evidence, "[t]he fact that the Board apparently would have preferred some other type of data . . . does not provide a valid basis for denying plaintiff's application." *Vill. of Plandome*, 2021 WL 4449453, at *17. *See Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 154 ("However, a zoning board['] s denial of an area variance based on a consideration that is not included in a local or state zoning law cannot be supported by substantial evidence.") (citations omitted); *Orange Cnty.-Poughkeepsie Ltd. P'ship*, 84 F. Supp. 3d at 304–05 ("[N]othing in the Code or the TCA requires that Plaintiffs present data on dropped calls or customer dissatisfaction, and, accordingly, it is not, without more, an adequate basis on which to deny the Application.").

Accordingly, the Village has not provided valid, evidentiary reasons for finding that ExteNet has not demonstrated need for improved service within the coverage contour. And the Village neither retained an expert to dispute ExteNet's tested evidence nor conducted its own testing to show that there is reliable service. (Joint Stipulation of Facts ¶ 71.) In light of the foregoing, the Court concludes that ExteNet has provided sufficient evidence demonstrating a deficiency in coverage within the coverage contour and that installing the small cells would remedy such deficiency. The Court concludes further that the

46

Board's finding that ExteNet failed show need is not substantiated by the record.

### b. The Installation of Small Cells Would Be a Minimal Intrusion on the Community

In addition, ExteNet has shown that installing the small cells would only minimally intrude on the community.  Small cells, consisting of small antennas, roughly two to three feet in height, and equipment boxes that are approximately three cubic feet in volume, are less intrusive, compared to macro-cellular towers, which are typically over 100 feet tall.  (Joint Stipulation of Facts ¶¶ 2—3; Lambert Decl. ¶ 6.)  Moreover, the record before the Court demonstrates that ExteNet, throughout the entire application process, has worked tirelessly and responsively with the Board and Village residents to ensure that the small cells intrude on the community as little as possible.  Specifically, ExteNet maximized using existing structures on public rights-of-way as installation points for the small cells.  In January 2019, ExteNet initially proposed using only three existing poles, (Lambert Decl. ¶ 41; Exhibit 4 to Lambert Decl.), but subsequently changed its plan to using twenty existing poles.  (Exhibit 19 to Lambert Decl.)

Furthermore, between the Board's revocation of the special exception permit in September 2019 and the September 13, 2021 Board meeting, ExteNet had numerous discussions with concerned residents regarding the installation sites and, in some

instances, was able to propose alternative sites for some of the nodes that were satisfactory to the residents. (Joint Stipulation of Facts ¶¶ 40–44, 52–53.)

Moreover, the Board's Decision denying the Second Application was not based on any failure on the part of ExteNet to demonstrate that granting the application would be minimally intrusive on the community. In fact, the Decision expressly states that the denial was not based on grounds related to intrusion on the community—i.e., the effect the deployment of the small cells could have on the aesthetics, property values, and the health and safety of the community. (*See* Exhibit 24 to Lambert Decl. at 7–8 ("The FCC has precluded this Board from denying the application because of any alleged adverse health impacts from the radio frequency emissions from the Facilities. The FCC has precluded this Board from denying the application because of aesthetic concerns if it would materially inhibit the wireless service. This Board finds that, despite its concerns on behalf of the residents, the application, specifically for Small Wireless Facilities, cannot legally be denied because of alleged impacts on property values.").

For the foregoing reasons, the Court concludes that ExteNet demonstrated the existence of gaps in coverage, that the gaps would be remedied by the proposed facilities, and, finally, that the facilities would be a minimal intrusion on the community.

48

Accordingly, the Board's denial of the Second Application based on a finding of lack of public necessity is not supported by substantial evidence.

### c. Other Reasons Provided in Support of the Board's Denial

The Court also respectfully rejects the Village's rationale that ExteNet failed to show that a denial of the application would materially inhibit the provision of wireless service. First, because the Village Code does not incorporate the standard imposed by section 332(c)(7)(B)(i)(II) of the TCA, which precludes state and local governments from actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," 47 U.S.C. § 332(c)(7)(B)(i)(II), a denial on such basis would not be based on substantial evidence. *See Vill. of Floral Park Bd. of Trs.*, 812 F. Supp. 2d at 155 ("[T]he Board primarily based its rejection of the Application on Verizon's failure to satisfy requirements that were not based in any applicable state or local law. Accordingly, the Court finds that each of the Board's proffered reasons for denying the Application are not supported by substantial evidence and therefore in violation of the TCA.")

Second, to read the section 332(c)(7)(B)(i)(II) standard into the Village Code would be inconsistent with the purpose of the TCA, which is to establish procedural requirements for state

and local governments to follow, while maintaining the established principles of local and state zoning laws as the applicable substantive standards. *Cellular Tel. Co.*, 166 F.3d at 494. *See MetroPCS, Inc. v. City and Cnty. of San Francisco*, 400 F.3d 715, 723—24 (9th Cir. 2005) ("[T]he substantial evidence inquiry does not require incorporation of the substantive federal standards imposed by the TCA, but instead requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable state and local law."), *abrogated on other grounds by T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293 (2015).

Finally, the Court likewise respectfully rejects the Village's argument that it could not grant a special exception permit for the proposed sites that are on private roads owned by the KOA. "The New York Court of Appeals has held that it is impermissible to deny a special permit based on an allegation or a claim that the approval would violate the private rights of a third party." *Omnipoint Commc'n, Inc. v. Common Council of Peekskill*, 202 F. Supp. 2d 210, 222 (S.D.N.Y. 2002) (citing *Friends of the Shawangunks, Inc. v. Knowlton*, 476 N.E.2d 988 (N.Y. 1985)). The Village argues further, without explanation, that a provision in section 84-8 of the Village Code related to building permits is applicable to installation of small cells and restricts the Village "from issuing a permit to any person or entity to work on private

property without that property owner's permission," specifically the roads owned by the KOA. (Def. Opp. at 10.) The Village, however, does not proffer any reason why section 84-8, which neither mentions telecommunications facilities nor is incorporated by reference into section 161, Article XII, which specifically deals with telecommunications facilities, is relevant.[15] Nor does the Village explain why section 84-8 applies to its decision to deny ExteNet's application for a special exception permit.

In sum, ExteNet has made a clear and substantial showing that the grounds upon which the Board denied the Second Application are not based on substantial evidence in the record. Therefore,

---

[15]    The Court notes that counsel for Defendant (the Village Attorney) represented to the Court at the December 16, 2021 pre-motion conference that he, as the attorney for the Village for over 40 years, can attest to the fact that the Village has always recognized these roads as private property owned by the KOA. (*See* ECF No. 30, December 16, 2021 Pre-Motion Conference Transcript, at 8-9.) Accordingly, if it were the case that the Village, all along, understood these roads to be private and that it would not be able to permit the installation of small cells on those roads without authorization from the KOA, it is questionable that the Village entered into a tolling agreement and an amendment to the tolling agreement wherein it agreed to not request any further information from ExteNet as a condition to voting on the Second Application if no authorization had been given. (Exhibits 14 and 18 to Lambert Decl.)

According to the KOA, the proposed sites for Nodes 5, 6, 9, 15, and 17 in the Second Application are on streets within Kennilworth. (Nejat Decl. ¶ 7.) In support, the KOA attached as an exhibit to the Nejat Declaration an excerpt from the application that shows the proposed locations for the five nodes. (ECF No. 18-13, Exhibit J to Nejat Decl.) Based on ExteNet's January 3, 2019 presentation of the First Application to the Board, it appears that the proposed sites for Nodes 5, 6, 9, 15, and 17 have remained the same since the First Application. (*Compare* Exhibit J to Nejat Decl. *with* Exhibit 4 to Lambert Decl. at 26, 29, 38, 56, 62.) Thus, the Village unanimously approved the First Application, which included the same sites within the KOA as the Second Application, but subsequently denied the Second Application based, in part, on the sites within the KOA, with which the Village took no issue in granting the First Application. The Court finds that this discrepancy in the Village's actions strongly militates against a finding that the Village's denial of the Second Application is supported by substantial evidence.

the Court finds that ExteNet has demonstrated a clear and substantial likelihood of success on its claim that the Village's decision was unsupported by substantial evidence.

### 4. Effective Prohibition of Personal Wireless Service

Pursuant to its goal of providing access to telecommunications services more broadly, the TCA restricts local governments from denying applications, the effect of which would "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). The Second Circuit has clearly stated that the TCA "precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land lines." *Willoth*, 176 F.3d at 643.

Because the relief sought by ExteNet on its "effective prohibition" claim is identical to that requested for the "substantial evidence" claim, the Court finds it unnecessary to also address the merits of ExteNet's effective prohibition claim. *Vill. of Plandome*, 2021 WL 4449453, at *23. Even if the Court were to consider the claim, the Court finds that the denial of ExteNet's application has prohibited the provision of personal wireless services within the Village. Consequently, the Court finds that ExteNet has established a clear and substantial likelihood of success on the merits of its effective prohibition

claim.

**C.    Balance of Hardships**

The balance of hardships tips decidedly in ExteNet's favor.  As noted previously, it has been almost five years since ExteNet first contacted the Board to discuss installing small cells to enhance wireless service in the Village.  Since then, ExteNet has worked with the Board and Village residents expeditiously and in good faith to address any questions and concerns, has granted several tolling requests, and has ensured that the nodes cause minimal intrusion to the community.  Notably, the Village Board stressed the need for improved wireless service in the Village for public safety and requested that ExteNet expand the coverage contour to cover more parts of the Village.

On the other hand, the Village has not sufficiently demonstrated that the small cells would result in negative impacts on either the health of its residents or the value of their property.  Even if some residents may experience hardship as a result of the purported aesthetic and visual impacts, such hardship is outweighed by the harm that ExteNet would experience without the grant of the relief it seeks. *See Vill. of Plandome*, 2021 WL 4449453, at *1, (granting plaintiff's motion for summary judgment and ordering the village board of trustees to grant plaintiff's application, reasoning, *inter alia*, that "it was plaintiff who engaged in good faith in a particularly arduous and drawn-out

application review process for over a year, only to have its application denied on mere pretense.").

### **PRELIMINARY INJUNCTION**

For the foregoing reasons, the proposed intervenors' motion to intervene is respectfully **DENIED,** and Plaintiff's motion for a preliminary injunction is **GRANTED.** The Defendant is ordered to grant Plaintiff's Second Application for a special exception permit to install thirty-one small wireless facilities in the Village of Kings Point.

**SO ORDERED.**

_____/s/_____
Kiyo A. Matsumoto
United States District Judge


Dated:  Brooklyn, New York
        May 31, 2022